(Reap. Dec. 10589)

BERNS & KOPPSTEIN, INC., ET AL. *v.* UNITED STATES

Entry No. 603, etc.

(Decided September 30, 1963)

*Katz, Wittenberg & Katz* (*Frank G. Wittenberg* of counsel) for the plaintiffs.
*John W. Douglas,* Assistant Attorney General (*Daniel I. Auster,* trial attorney), for the defendant.

DONLON, Judge: These 21 appeals, consolidated for trial, seek reappraisement of certain canned corned beef, packed in Paraguay by International Products Corp. The I.P.C. beef was packed in cases of 12 cans, each containing 6 pounds, and was imported from Paraguay at various dates, all but one of which were in 1959.

The exception is reappraisement 61/5174. Defendant contends that it is improperly consolidated for trial with the other appeals before the court, both because it relates to corned beef that was not packed under the I.P.C. brand label, and also because that merchandise

was imported on November 7, 1958, a date outside the period of importation that has been stipulated in these appeals. Plaintiff concedes that these allegations are fact. Although the official papers, transmitted to the court, show that this merchandise was invoiced and entered as 2,600 cases of I.P.C. canned corned beef from Paraguay, subsequent investigation has revealed that this is not so. Hence, reappraisement 61/5174 is severed from the consolidated cases. There is no evidence before the court relative to the merchandise of that appeal or as to its time of importation, and it is dismissed, therefore, for failure to prosecute.

As to the remaining 20 consolidated appeals, the litigated issue is the United States value of the merchandise.

It is stipulated that this merchandise is an item appearing on the final list published by the Secretary of the Treasury pursuant to the Customs Simplification Act of 1956, effective February 27, 1958 (T.D. 54521), for appraisement on the basis, if there be such, of foreign or export value, whichever is higher, under the old law, that is, section 402a of the Tariff Act of 1930, as amended. At the times of these exportations, it appears that a foreign or export value in Paraguay could not be established for such merchandise. (R. 4 to 10, inclusive.) While the stipulation is defective in that it only excludes the facts basic to foreign or export value of *such*, and not of similar, merchandise, it is presumed that the appraiser found that there was not a foreign or export value for similar merchandise, inasmuch as appraisement was on the basis of United States value, and that basis of appraisement is not contested. Appraisement on the basis of United States value is presumptively correct. *Sani Smoke, Inc.* v. *United States*, 47 Cust. Ct. 483, Reap. Dec. 10089; affirmed on review, 49 Cust. Ct. 505, A.R.D. 148; affirmed on appeal, 50 CCPA 82, C.A.D. 825. The presumption has not been rebutted.

Certain other facts, material to the *quantum* of United States value, have been stipulated. There is also oral testimony.

It is stipulated that the merchandise was loaded on river boats between April 23, 1959, and August 21, 1959, inclusive, at Asuncion, Paraguay, and shipped from Asuncion to Buenos Aires, where it was loaded in ocean carriers, bound for various ports in the United States. (R. 10.) It appears, therefore, that the period of exportation from Paraguay was between April 23, 1959, and August 21, 1959.

It is also stipulated that none of the merchandise was landed in the United States earlier than June 1, 1959. (R. 45, 46.)

United States value is defined in section 402a, as amended, as follows:

(e) The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for

domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

There is no dispute as to the amount which should be allowed, under this statutory formula, as a deduction from price for costs of transportation and insurance, and for other necessary expenses from the place of shipment to the place of delivery. These costs and expenses are stipulated as being $3.3224 per case. Both parties agree, also, that customs duty should also be deducted from price in order to arrive at value, but argue for duty allowances differing in amount, arithmetically dependent on the outcome of the value issue. Thus, while United States value is the basis of appraisement, there is disagreement here litigated as to the United States selling price, which is the basis from which computation of United States value proceeds, and there is also disagreement as to whether allowance should be made for general expenses, commissions, and profits, within the statutory formula.

The appraiser found that, at the dates of exportation of the Paraguayan corned beef of these importations, such or similar merchandise was freely offered for sale in the United States, in usual wholesale quantities and for domestic consumption, at a price of $35 per case, less 1 per centum discount. He used that as the United States selling price in his computation of value, and made no allowance for general expenses, commission or profit.

As to United States price, the record includes affidavits, some testimony and certain documentary exhibits.

Mr. Francis Koppstein, who identified himself as the secretary and treasurer of Berns & Koppstein, Inc., plaintiff herein, testified that the I.P.C. brand Paraguayan canned corned beef of these appeals was purchased by plaintiff from International Products Corp., 652 Madison Avenue, New York 22, N.Y., on or about March 30, 1959. The price was $25 per case f.o.b. Buenos Aires. There were 20,000 cases in the order, of which 10,000 were packed under the "I.P.C." label and 10,000 cases were identical merchandise but packed under a "Ricardo" label. (R. 16, 17; exhibit 2.) The entries with the documents filed with the court in these reappraisement appeals show the

following quantities and respective "marks" as to the entries of merchandise of the several appeals:

| Appeal | Plaintiff | Quantity | "Marks" |
|---|---|---|---|
| R.61/7169 | Berns & Koppstein, Inc. | 1, 000 cases* | La Ruta* |
|  |  | 200 | I.P.C. |
| R.61/7663 | " | 350 | I.P.C. |
| R.61/7665 | " | 750 | I.P.C. |
| R.61/10063 | " | 250 | I.P.C. |
| R.61/10064 | " | 1, 500 | I.P.C. |
| R.61/10065 | " | 1, 250 | I.P.C. |
| R.61/10066 | " | 1, 350 | I.P.C. |
| R.61/10067 | " | 250 | I.P.C. |
| R.61/9230 | " | 200 | I.P.C. |
| R.61/9231 | " | 250 | I.P.C. |
| R.61/9232 | " | 150 | I.P.C. |
| R.61/9233 | " | 350 | I.P.C. |
| R.61/13468 | " | 1, 250 | I.P.C. |
| R.61/13469 | " | 1, 300 | I.P.C. |
| R.61/19006 | " | 50 | I.P.C. |
| R.61/7662 | " | 250 | I.P.C. |
| R.61/13466 | Morris Friedman | 1, 000 | I.P.C. |
| R.61/13467 | " | 990 | I.P.C. |
| R.61/5175 | Aut Custom Brokers, Inc. | 1, 500 | I.P.C. |
| R.61/5176 | " | 750 | I.P.C. |

*There is no appeal for reappraisement of these 1,000 cases of La Ruta brand second-grade beef.

The merchandise of these appeals is, therefore, 13,940 cases. Appraisement of the balance of the total order of 20,000 cases seems not to be involved.

Mr. Koppstein testified that, after this purchase had been made, and on March 30, 1959, his firm (plaintiff) freely offered the corned beef for sale in the United States through food brokers. Affidavits of eight food brokers, as to how they offered the corned beef, are in evidence. (Collective exhibit 1.) These affidavits are variously dated in the months of October and November 1962; each affidavit is subscribed and sworn to either by the owner or by an officer of a food brokerage concern; and the business offices of these firms are located in Baltimore, Philadelphia, Jacksonville, New Orleans, Albuquerque, Seattle, Boston, and Los Angeles.

Each affidavit recites, practically in identical language, that, during the months of April to September 1959, the affiants "brokered" I.P.C. brand corned beef, packed in 6-pound cans, 12 cans to a case, for Berns & Koppstein, Inc., at a "freely offered" price to all purchasers of $33.84 per case, less 1 per centum discount, 10-day terms, ex-dock or ex-warehouse in the port of entry. For their services, seven of these eight food brokers were offered a selling commission of 3 per centum of the selling price; one broker was offered a commission of 2 per centum.

Mr. Koppstein stated that, under instructions of counsel, he had sent proposed affidavits to these brokers and had asked them to execute the affidavits. To his own knowledge, everything stated in the affidavits is true. However, the fact is that Berns & Koppstein, Inc., did accept prices lower than $33.84 per case on sales of large quantities. (R. 19, 20.)

Mr. Koppstein identified certain correspondence of his firm with food brokers. Copies of these letters are in evidence. (Exhibits 3 to 9, inclusive.) They show correspondence with seven food brokers located, respectively, in Cleveland, Ohio; Roanoke, Va.; Feasterville, Pa.; New Orleans, La.; Richmond, Va.; Winston-Salem, N.C.; and Toledo, Ohio. The earliest such correspondence has the date of April 30, 1959, and the latest is dated June 30, 1959. These are general business letters.

The letter, dated April 30, 1959, gave notice to Dan C. Mulligan Co., of Cleveland (exhibit 3), that Berns & Koppstein, Inc., expected to receive a supply of Paraguayan corned beef, "institutional" size, twelve 6-pound cans to a case, which they offered for sale through the broker at a price of $33.84 per case, ex-dock, less 1 per centum, 10 days cash, and 3 per centum commission.

Under date of May 15, 1959, Berns & Koppstein, Inc., gave like notice to Virginia Brokerage Co. of Roanoke. (Exhibit 4.)

On May 15, 1959, in a letter to W. N. D'Angelos & Associates, of Feasterville, Berns & Koppstein, Inc., quoted the following prices: $33.84 per case for small quantities; $33.50 on orders of 100 cases and up; and $33 on orders of 1,000 cases and up. On such sales, a commission of 2 per centum was offered, and there was to be no cash discount. (Exhibit 5.)

On May 27, 1959, Berns & Koppstein, Inc., wrote Fortier, Brown & Horil, of New Orleans, offering the beef for $33.84 per case, ex-dock and with duty paid, 3 per centum commission. However, they said that they would accept a price of $33.50 on orders of 100 cases and up, and $33 on orders of 500 cases and up. (Exhibit 6.)

On June 26, 1959, in a letter to Chas. A. Bunn Co., of Winston-Salem, the offer was of a price of $33.84 for "small orders"; a price of $33.50 for 50 to 100 cases; and $33 on orders of 100 cases and up. There was no statement as to commission terms, or delivery point. (Exhibit 8.)

On June 30, 1959, plaintiff wrote Boos-Haas Co., Toledo, offering a price of $33.84 per case, ex-dock port of entry, for small quantities up to 50 cases; $33.50 per case for quantities up to 100 cases; and $33 for larger quantities. Commission offered was 3 per centum. (Exhibit 9.)

Mr. Koppstein testified that, between April 23, 1959, and August 21, 1959, he did not instruct any food broker to sell I.P.C. brand corned

beef at prices in excess of $33.84 ex-dock, regular port of entry in the United States, 1 per centum discount, 10-day terms. That price was arrived at as the maximum they could get for small quantities, based on costs and competitive prices. (R. 27.)

Plaintiff's brief states (p. 3) that one "can" of corned beef may be considered the usual wholesale quantity, but it is stipulated by the parties that, at or about the times of exportation, the usual wholesale quantity for I.P.C. brand corned beef was one case. (R. 65.) The court so finds.

A schedule of sales made by plaintiff between April 23, 1959, and May 20, 1959 (exhibit 10), lists six sales aggregating 10,600 cases, of which the smallest quantity was 100 cases and the largest quantity was 7,500 cases. All of these sales were at prices under $33.84.

A schedule of plaintiff's sales made between May 21, 1959, and August 22, 1959 (exhibit 11), lists 93 sales for an aggregate of 8,315 cases. Exhibit 12 analyzes these sales. Twelve sales, for a total of 69 cases, were at prices in excess of $33.84 per case. With a single exception, these sales were either ex-warehouse and not ex-dock, or for delivery at an inland destination. One sale was for five cases of the corned beef, sold in Boston by the food broker there, at a price of $34.56 per case, which was in excess of the broker's instructions. Berns & Koppstein, Inc., did not object.

Between May 16, 1959, and August 21, 1959, there was at all times an inventory of I.P.C. Paraguayan corned beef for delivery. (R. 31.)

Defendant introduced the testimony of Mr. Thomas J. Lenihan, identified as having been connected with International Products Corp. for 30 years and as its vice president and treasurer in 1959, the year with which these appeals are concerned. (R. 54.) His firm imports 6-pound corned beef, packed 12 cans to a case, from its affiliated or branch firm, International Products Corp. of Paraguay, on consignment for sale in the United States. Such merchandise is imported every year, and was imported in 1959, although Mr. Lenihan could not recall the details of such imports in that year. (R. 55.) His firm did, however, have an inventory of such canned corned beef on hand from April 1959 to October 1959, for sale in the United States. It was his regular practice to transmit monthly sales invoices to the appraiser of merchandise for the port of New York. (R. 56.) A list of monthly invoices so transmitted is in evidence (collective exhibit A), but is evidentiary only as to sales made in 1959 between April 23 and August 21, the period of exportation. (R. 59.)

Mr. Lenihan stated that the invoices of exhibit A are copies of originals prepared and sent out by his office in regular course of business. He said they reflect an actual selling price of $35 per case, less 1 per centum discount, 10 days, for I.P.C. brand canned corned beef, identical to that which his firm sold to plaintiff. The exhibit A invoices are

variously dated. The earliest is April 27, 1959. Two of these invoices show a price less than $35 per case. Exhibit A–1, a billing of June 24, 1959, shows such I.P.C. canned corned beef sold at different prices to Fred E. Reed & Associates, Greenville, S.C., namely, 51 cases at $35 per case, and 50 cases at $32.50 per case. Exhibit A–2, billing of May 7, 1959, to Fred E. Reed & Associates, also shows different prices for such I.P.C. corned beef, 25 cases at $35 per case, and 23 cases at $32.50 per case. Mr. Lenihan explained this by saying that the price of $32.50 was the best he could get at the time for the particular lot sold at that price. (R. 62.) He testified that the $35 price was competitive with the prices of large meatpackers, such as Swift and Armour, and represented the best price at the time. (R. 63.) He said that the price included, as to a quantity of the merchandise, the cost of inland transporation and warehousing. (R. 64.) He also testified that his firm paid a selling commission of 3 per centum to brokers. (R. 65.) Dates on exhibit A are invoice dates, rather than dates of delivery, and presumably, therefore, they are not the dates of offers or even of sales. Mr. Lenihan did not know when the sales so invoiced had been made. (R. 64.)

It should be noted that Mr. Lenihan's price of $35 per case included delivery charges from port of entry to inland warehouse, whereas Mr. Koppstein's price of $33.84 was for delivery ex-dock, with slightly higher prices (but all less than $35) for delivery at an inland warehouse or other inland destination.

In arriving at the United States value of imported merchandise, it is necessary, first, to find where the principal market of the United States for such or similar merchandise is located and, second, what the freely offered price is in that United States market *at the time of exportation* from the foreign country. There are subsidiary issues, but these are the first findings to be made.

There seems little doubt that the principal United States market for this particular pack of Paraguayan corned beef was, on the facts of record, located in New York City. That is where plaintiff made its offerings. That is where International Products Corp. made its offerings. On the record before us, New York is the principal market of the United States for this merchandise.

Nor is there room for debate as to the time of exportation of the merchandise to be valued. This corned beef was shipped out of Paraguay on river steamers that left Asuncion, the first shipment on April 23, 1959, and the last shipment on August 21, 1959. Asuncion is a river port directly on the Argentine border, so it may properly be assumed that these are the times of exportation from Paraguay. As our appeals court pointed out in *E. H. Corrigan* v. *United States*, 40 CCPA 171, C.A.D. 514 (at p. 175), it should be understood that the phrase "at the time of exportation" does not necessarily mean the

hour or the day of exportation, but a time near enough to the date of exportation and under such circumstances as will reflect the price of the goods on the date of exportation, citing *United States* v. *New York Merchandise Co., Inc.*, 31 CCPA 213, C.A.D. 274.

The time of exportation from Paraguay of the merchandise undergoing valuation, was between April 23, 1959, and August 21, 1959.

While the prices at which imported merchandise actually is sold in the United States are not necessarily irrelevant to United States price, it is the offering price before arrival "at the time of exportation" that is basic to United States value. This is so because it is accepted that the concept of United States value was devised by Congress to approximate export value in circumstances where the statutory conditions for export value do not subsist. *United States* v. *New York Merchandise Co., Inc.*, 31 CCPA 213, C.A.D. 274.

At one time it was the rule, laid down by our appeals court, that the statute requires valuation on the basis of offers of prototype merchandise available in the United States. That meant either prototype merchandise of domestic origin or of prior importation. *United States* v. *New York Merchandise Co., Inc.*, 31 CCPA 213, C.A.D. 274.

In *E. H. Corrigan* v. *United States*, 40 CCPA 171, C.A.D. 514, our appeals court, in the reappraisement of garlic powder, imported from Mexico, felt "constrained to hold that offers of sale and sales for future delivery properly may be taken into consideration in determining United States value . . . in cases where the facts and circumstances show that such procedure is followed in the ordinary course of trade, and the other requisite statutory elements are present." (P. 182.)

The court below, in the *Corrigan* case, had failed to study offers and sales for future delivery, following the rule of the *New York Merchandise* case, *supra*. What our appeals court did in *Corrigan* was to remand to the trial court, to the end that the evidence be restudied and acted upon in conformity with the modified holding, as to the law, laid down in the *Corrigan* decision.

The trial judge, therefore, is first to find a United States price, on the basis of facts which may include evidence, not only of offers to sell and sales of prototype merchandise imported previous to exportation of the valued merchandise, but also of offers to sell and sales for future delivery "where the facts and circumstances show that such procedure is followed in the ordinary course of trade."

Here, there is evidence of invoices, during the period between April 23, 1959, and August 21, 1959, which is the period of exportation of this merchandise from Paraguay, of previously imported prototype merchandise. Such invoices were billed by International Products Corp., affiliate of the Paraguayan exporter. We have no evidence relating invoice dates, as shown in exhibit A, to dates of sale

or of delivery, and none as to times of offers. We do not know whether they were or were not sales previously made for future delivery.

Defendant argues that the principle of the so-called primary, or dominant, market requires the court to exclude plaintiff's evidence of its offers to sell, in deciding what is United States price. The argument runs that International Products Corp., in New York, is an affiliate of the Paraguayan manufacturer of this merchandise; that, because of this corporate affiliation, offers by I.P.C. in New York "dominate" the United States market, as export value in Paraguay would be dominated by the offers and/or sales of the manufacturer; and that when, as here, there is evidence of sales by I.P.C. in New York, it is those sales that constitute evidence of offers in the principal United States market, to the exclusion of other offers.

In support of this argument, defendant cites the decision in *Rodriguez* v. *United States*, 23 Cust. Ct. 296, Reap. Dec. 7752.

In the *Rodriguez* case, the trial judge held that the evidence adduced by plaintiff made it impossible to find a single freely offered price for export to purchasers in the ordinary course of trade, and, for that reason, the presumption of correctness attaching to the appraiser's finding of value had not been overcome. *Idem*, 19 Cust. Ct. 268, Reap. Dec. 7405.

The appellate division (Judge Cole, dissenting) upheld the contention of plaintiff that, in weighing the evidence of price offerings and sale prices before the court, only the evidence as to sales for export by the manufacturer should be considered, for the reason that the manufacturer's price met the statutory requirements, citing *Anthony Mahler*, Reap. Circ. 28878, and *United States* v. *S. S. Kresge Co. et al.*, 26 CCPA 349, C.A.D. 39, affirming, *Idem*, 73 Treas. Dec. 1547, Reap. Dec. 4310.

The *Mahler* decision is an old one, handed down in 1918 by General Appraiser Fischer. The importer entered merchandise at export value based on the price paid to an English manufacturer on sales for export to the United States. The appraiser advanced value to the higher price at which an English dealer, buyer from the same manufacturer, had resold like merchandise, also for export to the United States. The general appraiser reversed this action, upholding the importer's claim to the lower value based on the manufacturer's price.

It is a sound principle that export value, for dutiable purposes, is the price at which merchandise is freely offered for sale in the country of exportation in the usual course of trade. In the *Mahler* case, the general appraiser found that the freely offered price in the usual course of trade was the manufacturer's offering and that occasional sales made by dealers there did not constitute the market.

In the *Kresge* case, our appeals court applied and clarified the *Mahler* decision. *United States* v. *Kresge Co. et al.*, 26 CCPA 349, C.A.D. 39.

There was evidence, in the *Kresge* case, that the foreign manufacturer had catalog prices for the merchandise, both for domestic sale in the country of exportation and for export there to the United States, stated to be plus packing costs and profit. The importer claimed that these catalog prices were the freely offered prices. However, the appraiser advanced value to reflect higher prices paid to certain foreign dealers in what the court described as "fugitive" sales. The court disallowed this advance.

There is nothing in the *Mahler*, *Kresge*, or *Rodriguez* cases that supports the rule for which defendant argues, namely, that sales in the United States, by the domestic affiliate of a foreign corporation, of goods imported into the United States by the affiliate on consignment from the foreign corporation so dominate the United States market as to require exclusion, as a matter of law, of evidence of other offers of like merchandise, freely made within the statutory concept. The task of the court here, as in the cited cases, is to weigh evidence in order to determine which offers are in the ordinary course of trade.

Nothing is cited here that is persuasive of a congressional intention that, for duty purposes, the ordinary course of trade within the United States in the importation of goods is the shipment of such goods by foreign manufacturers on consignment to their United States affiliates, to the exclusion of other courses of trade in imported goods. Consignment to an affiliate may very well be one of the ways in which trade is carried on in the United States; but at least until proofs are adduced that it is the ordinary course of trade in the United States, as contemplated by Congress, it seems clear that there is no basis for concluding, as a matter of law, that *only* such a course of trade is to be deemed "ordinary," to the exclusion of the more usual course of purchase of foreign goods by United States nationals for importation into the commerce of the United States, and sale.

Analysis of the evidence of offers, as adduced by plaintiff, and of the evidence of sales in support of such offers, together with defendant's proofs of invoice billings by the I.P.C. domestic affiliate, during the period of exportation of this merchandise, supports plaintiff's contention that its offers were made in the ordinary course of trade. Certainly, they involved a far greater volume of the merchandise than the affiliate's trade would seem to indicate.

Plaintiff has shown that it offered 20,000 cases of this merchandise during the period of exportation from Paraguay, at a price of $33.84 per case, less commission and discount. Plaintiff actually sold, during that period, 8,315 cases in 93 sales. There were 8,246 cases sold at prices of $33.84 or below, and these were sales ex-dock. The remaining 69 cases were sold at prices up to $34.56; but they were sales ex-

warehouse or other point and not ex-dock, except for 5 cases sold in Boston in what was said to be a sale priced in error.

During the same period, defendant's evidence shows that I.P.C., New York, billed buyers for an aggregate of 433 cases of this merchandise, all offered, sold, and delivered at unstated dates, including 48 cases which are stated to have been billed in "April." (Exhibit A-2.) Since the earliest date of exportation has been stipulated as April 23, 1959, and these are sales shown to have been invoiced in April, there is no way of telling, from defendant's proofs, whether they fell within the period of exportation, or not. They are, therefore, excluded. (Parenthetically, it may be noted that those 48 cases were sold at an average price below $35 per case.)

Of the remaining 385 cases billed by I.P.C., New York, during the period of exportation, there were 284 cases billed at $35 per case, on various terms. There were also 101 cases billed to Fred E. Reed & Associates, of Greenville, S.C., on June 24, 1959. (Exhibit A-1.) (Other merchandise was included in that billing.) These 101 cases were divided into 2 lots, 1 lot of 51 cases at the $35 price and the other lot (billed on the same date and to the same customer) at $32.50 per case. Without some adequate explanation, it would appear that 101 cases were sold to Reed for a price that averaged $33.80 per case.

Thus, there were 20,000 cases offered by plaintiff at $33.84, the United States price for which it contends; during the period of exportation plaintiff sold 8,246 cases at prices not in excess of $33.84 per case, ex-dock; plaintiff, in the same period, sold 69 cases at prices up to $34.56 per case, but on other terms than ex-dock and including 5 cases priced in error; I.P.C., New York, billed, within the same period, for 385 cases of the merchandise, of which 284 cases were billed at $35 per case and 101 cases were billed to a customer under circumstances that seem to show an average price of $33.80 to that customer for those 101 cases.

I find that plaintiff freely offered the merchandise at a price of $33.84 per case, ex-dock, with brokerage commission of 3 per centum, less 1 per centum discount, terms 10 days, and that the weight of evidence before me as to sales confirms that such offers at that price were in the ordinary course of trade and in the usual wholesale quantity.

The statutory items for allowance as deductions from United States price, in computing United States value, are "duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or *profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.*" [Emphasis supplied.]

Plaintiff claims allowances for the underlined items, inasmuch as the goods under valuation are shown to be purchased goods. De-

fendant contends that, notwithstanding the goods were indeed purchased, plaintiff has no right to these allowances, because of the fact that another importer, I.P.C. of New York, imported similar merchandise otherwise than by purchase, viz, on consignment, and that I.P.C., New York, did not pay or contract to pay a commission.

The basis of defendant's argument seems to be that there can be, at any one time, only one *value* for the appraisement of like merchandise imported into the United States. This argument confuses the concepts of price and of value.

There can be, at any one time, only one United States price as the basis of computing United States value. However, all of the statutory allowances from price are related to proofs of facts which may differ as to different importations. When it comes to the alternatives of commission, on the one hand, or of profits and general expenses, on the other hand, Congress could hardly have been clearer in stating what it intended.

If the fact is acquisition by consignment, then the fact as to payment or contract to pay commission (*not over 6 per centum*) is controlling of allowance in such a case.

If the fact is acquisition by purchase, then profit and general expense allowances are authorized.

These are purchased goods. The statutory allowances from price, prescribed as to such goods, are proper.

Mr. William V. Ehrens, a certified public accountant who has worked for plaintiff for from 12 to 14 years, testified as to plaintiff's general expenses and profits. Their fiscal year runs from June 1 to May 31. He had with him statements drawn from the accounts for the year June 1, 1959, to May 31, 1960.

From his testimony, affirmed on cross-examination, it appears that commissions paid to brokers were not included in general expenses, but were added as a cost of goods purchased. Other general expenses, according to Mr. Ehrens' computation, averaged 3.04 per centum of sales.

As to profits, Mr. Koppstein identified a calculation of actual profit (exhibit 14) which shows that profits on sales of the canned corned beef in issue were $1.675 per case. This testimony was not challenged on cross-examination. This profit is approximately 5 per centum, and, therefore, it is under the statutory ceiling of 8 per centum.

I find as facts:

1. That the merchandise of these appeals is I.P.C. brand canned corned beef, packed in cases of 12 cans, 6 pounds each, which was exported from Paraguay, pursuant to purchase agreement, between April 23, 1959, and August 21, 1959.

2. That canned corned beef is an article specified in the final list of articles published by the Secretary of the Treasury pursuant

to the Customs Simplification Act of 1956, effective on and after February 27, 1958.

3. That, at the times of exportation of this merchandise, such or similar merchandise was not freely offered in the principal markets of Paraguay, in the usual wholesale quantities and in the ordinary course of trade, for sale to all purchasers, either for consumption in Paraguay or for exportation to the United States.

4. That, at the times of exportation of this merchandise, such merchandise was freely offered for sale in the United States to all purchasers, in usual wholesale quantities and in the ordinary course of trade, in the principal market at New York.

5. That, at the times of exportation, the canned corned beef of these appeals was freely offered for sale in the United States in the ordinary course of trade to all purchasers, in usual wholesale quantities of one case, at a price of $33.84 per case, less 1 per centum discount, with commission paid to brokers at the rate of 3 per centum.

6. That the costs of transportation, insurance, and other necessary expenses incurred in the shipment and delivery of the canned corned beef of these appeals was $3.3224.

7. That the general expenses of doing business were 3.04 per centum and profit 5 per centum of selling price.

8. That the commission paid was 3 per centum of selling price.

9. That the merchandise is advisorily classified under paragraph 706 of the Tariff Act of 1930, as modified, subject to duty at 15 per centum ad valorem.

10. That the value of the merchandise of these appeals with allowance for duty, cost of transportation, insurance, and other necessary expenses from place of shipment to the place of delivery, profit, and general expenses, computed per case, is as follows:

| | | |
|---|---|---|
| United States selling price | | $33.84 |
| less 1% discount | | 0.3384 |
| | | $33.5016 |
| Less | | |
| Cost of transportation, insurance, and other necessary expenses | $3.3224 | |
| General expenses: 3.04% of $33.5016 | 1.0184 | |
| Sales commission: 3% of $33.84 | 1.0152 | |
| 5% profit | 1.675 | |
| 15% customs duty | 3.4526 | |
| | | 10.4836 |
| | | $23.0180 |

I conclude as a matter of law:

1. That, at the times of exportation, there was no foreign value or export value for the canned corned beef, subject of these appeals,

as such values are defined in section 402a of the Tariff Act of 1930, as amended.

2. That United States value, as defined in section 402a(e) of the Tariff Act of 1930, as amended, is the basis of value for appraisement of such merchandise.

3. That the United States value of the entry I.P.C. brand canned corned beef is $23.0180 per case, as computed in finding of fact number 10.

Reappraisement 61/5174 is dismissed.

Judgment will enter accordingly.